**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Marcia S. Krieger**

**Civil Action No. 10-cv-03116-MSK-MJW**

**PATRICK CILLO;**
**INTERNATIONAL UNION OF POLICE ASSOCIATIONS, AFL-CIO ("IUPA"),**

      **Plaintiffs,**

**v.**

**CITY OF GREENWOOD VILLAGE, a body corporate and politic;**
**DONNIE PERRY, in his individual capacity;**
**JOSEPH HARVEY, in his individual capacity; and**
**JAMES SANDERSON, in his individual capacity,**

      **Defendants.**

_____

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**
**AND DENYING MOTIONS TO RESTRICT ACCESS**
_____

     **THIS MATTER** comes before the Court pursuant to the Defendants' Motion for

Summary Judgment **(# 34, 36)**, the Plaintiffs' response **(# 41, 42)**, and the Defendants' reply

**(#45-1)**.  Each of these filings is accompanied by motions **(# 35, 40, 45)** seeking to have the

entirety of the motion papers filed under restricted access pursuant to D.C. Colo. L. Civ. R. 7.2.

## FACTS

     The following is a brief summary of the pertinent facts, construed most favorably to Mr.

Cillo.  Further elaboration will be provided as necessary to the analysis.

     Mr. Cillo was employed as a police officer for the City of Greenwood Village.  The

police department is overseen by it's Chief, Mr. Perry, who is assisted by Mr. Harvey, one of

1

Mr. Perry's Lieutenants.  Mr. Sanderson, as City Manager of Greenwood Village, has appellate review of termination decisions involving police officers.

In 2007, Mr. Cillo began attempting to organize his fellow police officers into a union. By August, the union had been organized and Mr. Cillo had been elected to serve as President of International Union of Police Associations ("IUPA") Local 305, the Plaintiff in this matter.  He contends that thereafter, the Defendants discriminated against him for his union activities, such as by stripping him of work assignments and denying him opportunities to attend training programs.

In June 2009, Mr. Cillo was involved in a situation in which officers under his supervision unlawfully entered a motel room and arrested a suspect (the "Motel 6 incident"). Following the incident, the police department sought the termination of Mr. Cillo and certain other officers who were involved, contending that the officers' actions during the motel incident violated the arrestee's Fourth Amendment rights and police department policies.  Mr. Cillo's employment  was terminated, and he was unsuccessful in his appeal of the termination to Mr. Sanderson.  Mr. Cillo contends that the termination was in retaliation for his having engaged in union activities.

The Plaintiffs (which include Mr. Cillo and the IUPA itself) assert three causes of action: (i) a claim, brought by both Mr. Cillo and the IUPA,[1] for violation of 42 U.S.C. § 1983, in that the Defendants discriminated or retaliated against them for Mr. Cillo having engaged in rights to free association with other union members under the First Amendment to the U.S. Constitution;

---

[1] Although the Court has some question as to the basis for the IUPA's claim, the parties agree that the IUPA's claim necessarily stands or falls in accordance with Mr. Cillo's § 1983 claim. Thus, the Court will not address the IUPA's claim separately.

(ii) a claim by Mr. Cillo that the City of Greenwood Village violated C.R.S. § 24-34-402.5 by discriminating against him for having engaged in lawful, off-duty activities, namely, his union activity; and (iii) a claim by Mr. Cillo for tortious interference with contract, asserted solely against the individual Defendants, in that Mr. Cillo "had an at-will employment contract with" the City of Greenwood Village and the Defendants "intentionally and improperly induced the [City] to breach that contract" by firing him.

The Defendants have moved (**# 34, 36**) for summary judgment against both Mr. Cillo and the IUPA, raising the arguments discussed below.

## <u>ANALYSIS</u>

### A.  Standard of Review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby

favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P. 56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward,* 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material fact, no trial is required.  The court then applies the law to the undisputed facts and  enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a prima facie claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**B.  First Amendment Claims**

To establish a claim for unlawful retaliation against a public employee based on that employee's exercise of First Amendment rights, the employee must make a prima facie showing: (i) that he engaged in constitutionally-protected First Amendment activity; (ii) that the defendant took an adverse  action against him that would chill a person of ordinary firmness from

continuing to engage in that activity; and (iii) that the adverse action was substantially motivated by the employee's protected activity. *Shero v. City of Grove,* 510 F.3d 1196, 1203 (10th Cir. 2007).

<u>1.  Protected activity: the "public concern" question</u>

When the government is acting in its capacity as employer, rather than its capacity as sovereign, it enjoys a broader ability to regulate the speech and conduct of employees than it would have in regulating speech or conduct by private citizens. *See generally Waters v. Churchill*, 511 U.S. 661, 671-72 (1994) ("the government as employer indeed has far broader powers than does the government as sovereign").  In attempting to strike a balance between the government's need (as an employer) to efficiently manage its workforce and the public worker's right (as a citizen) to invoke his or her First Amendment right to speak out on matters of public importance, the U.S. Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), held that a public employee who speaks out on a matter of public concern enjoys the full protection of the First Amendment against retaliation in the employment sphere.  In *Connick v. Meyers*, 461 U.S. 138, 146-47 (1983), the Supreme Court explored the converse situation, concluding that where a public employee's speech "cannot be fairly characterized as constituting speech on a matter of public concern . . . government officials should enjoy wide latitude in managing their offices," such that "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."

Although identifying the *Connick* "public concern" test is simple, applying it is not necessarily so.  Indeed, determining whether the test applies to the facts presented here is a particularly knotty question.

### a. The "public concern" test's application in associational cases

The first difficulty in determining whether the *Connick* test applies turns on whether the alleged First Amendment right exercised by the public employee is a right of speech or a right of association.  Here, Mr. Cillo frames his claim as Defendants' retaliation based on his association with others as members of a union.

Until recently, the question of whether *Connick*'s "public concern" test applied in cases founded on associational rights resulted in varying conclusions in the Circuit Courts of Appeal.  The 10th Circuit repeatedly declined to announce a position.  However, in 2011, in the decision in *Merrifield v. Board of County Commissioners*, 654 F.3d 1073, 1080 (10th Cir. 2011), the Tenth Circuit addressed the question of whether the "public concern" test applied in cases involving a public employee's claim of retaliation for the exercise of associational rights.

*Merrifield* involved a public employee who claimed he was retaliated against after hiring a lawyer to represent him in an appeal of a disciplinary decision.  The 10th Circuit began its analysis by noting two distinct types of associational rights protected by the First Amendment: (i) the "intrinsic" right to "enter into and maintain certain intimate human relationships"; and (ii) the "instrumental" right to associate for the purpose of engaging in other First Amendment rights such as speech, assembly, and petitioning the government.  *Id. at* 1081-81.  It characterized an employee's right to associate with a lawyer as an "instrumental" right, and held that "the public-concern requirement applies to a claim that a government employer retaliated against an

6

employee for exercising the instrumental right of freedom of association for the purpose of engaging in speech, assembly, or petitioning the government." *Id. at* 1081-82.  It reasoned that associational rights should not be treated differently from the substantive First Amendment rights that the association was intended to promote.  Thus, it would be incongruous to require employees to satisfy the "public concern" test when they claimed to have been retaliated against for engaging in speech, assembly, or petitioning the government, but excuse them from that showing when they associated for the purpose of engaging in that same speech, assembly, or petitioning. *Id.* at 1083.

Mr. Cillo's associational claims are of the same "instrumental" character as those of the employee in *Merrifield*.  Mr. Cillo associated with his fellow officers as members of a union for the purpose of enhancing his ability to speak to issues concerning working conditions, or to petition for redress of grievances.  Thus, under *Merrifield*, Mr. Cillo is required to demonstrate that his associational activities satisfy the *Connick* "public concern" test.

b.  Exception to the "public concern" test for union-based association

Finding that Mr. Cillo asserts an instrumental associational right subject to the *Connick* test is not the end of the inquiry, however.  There is another question yet to address – whether the 10th Circuit has recognized a special exception to the *Connick* test where the associational activity is related to organization or membership in a union.  This issue requires a historical survey of 10th Circuit precedent on the point.

The first significant case is *Morfin v. Albuquerque Public Schools*, 906 F.2d 1434 (10th Cir. 1990).  There, teachers alleged that they were subjected to retaliation for, among other things, speaking out over disagreements with management, meeting with union officials, and

filing union grievances.  Affirming the trial court's denial of summary judgment in favor of certain management employees, the court began with the proposition that "the First Amendment protects the right of a public employee to join and participate in a labor union," a right to file grievances, and a right to "associate with the union of his or her choice, even one other than the exclusive bargaining agent."  *Id. at* 1438, 1439 (internal quotes omitted).  But because the issue before the court arose on the assertion of qualified immunity, the analysis in *Morfin* concerned whether these rights were "clearly established."  Thus, the court was not called upon to address whether employees were required to demonstrate that their union association furthered a public concern (*i.e.* that they satisfied the *Connick* test) in order to proceed against the governmental entity.[2]

Next, *Butcher v. City of McAlester*, 956 F.2d 973 (10th Cir. 1992), contains *dicta* addressing public employee rights to participate in a union, but does not squarely resolve whether there is or is not an exception to the *Connick* test where the protected activity involves participation in a union.  In *Butcher*, public employees complained  that their employer singled them out for harassment and discipline because of their  involvement in a local union.  After a jury returned a verdict in the employees' favor, the employer sought judgment as a matter of law on associational claims, but the motion was denied by the trial court.  On appeal, the employer argued that the trial court erred in applying a test that required  balancing the employer's legitimate interests in managing its workforce against the employees' First Amendment rights.[3]

---

[2]  The court did address the question of whether the employees' **speech** claims – premised on the employees' criticism of the school administration's new student discipline policy – had satisfied the "public concern" element, summarily concluding that they had.  *Id. at* 1437-38.

[3]  This is often referred to as the "*Pickering* balancing" test.  The parties here do not contend that the *Pickering* balancing is necessary in this case.

The trial court resolved this balance in favor of the employees, and the 10th Circuit agreed.  It noted that although the employer had the right to demand compliance with the terms of the effective collective bargaining agreement, it had "no license, where there is a collective bargaining agreement, to embark on union-busting activities." *Id. at* 979.   The court explained that "we fail to see how, where there is a collective bargaining agreement between the parties, the City had any legitimate interest in whether its firefighters elected to join the union and participate in its activities, or stay out of the union." *Id.*

The issue became sharper in *King v. Downing*, 58 Fed.Appx. 830, 833 (10th Cir. 2003) (unpublished).  There, the court affirmed entry of summary judgment against a public employee who claimed retaliation based on his efforts to form a union, in part, because the employee did not show that his union association was furthering a matter of public concern.  In his appeal, the employee apparently conceded that his union activities did not implicate matters of public concern, but argued that "the district court erred in applying the [ ] *Connick* 'public concern' . . . test to this claim" because he alleged that "his First Amendment associational rights as well as his free speech rights" had been infringed. *Id. at* 833.  The court acknowledged that the "public concern" test "may not be a precise enough tool of analysis in some public employee/free association contexts," but nevertheless concluded that "where the free speech and free association claims are identical, as they are in this case, application of the [ ] *Connick* public concern test is appropriate."[4] *Id.*

---

[4] *King* also noted that "an employee's speech or activity does not touch on a matter of public concern merely because it is union-related," and that the court must still make a fact-based inquiry into the public interest implicated by the speech. *Id.* at 833 n.1.

The issue became even more focused in *Shrum v. City of Cowetta*, 449 F.3d 1132, 1138 (10th Cir. 2006).  There, a police officer contended that he had been disciplined and assigned less favorable shifts in retaliation for serving as bargaining agent for the police officers' union. *Id.* at 1138.  In *Shrum,* the question of whether the officer had to satisfy the "public concern" test was directly considered by the court.  The 10th Circuit briefly noted that neither it nor the Supreme Court had determined whether the "public concern" test applied to associational claims. *Id.* at 1138.  It then concluded that "we need not reach the broader question" because "in the specific context of public employee labor unions, this Court has rejected the requirement that a worker demonstrate that his association with the union be a matter of public concern." *Id.*  The court briefly discussed cases such as *Butcher* (which it characterized as rejecting an argument that the employees there "had no constitutional claim because their union activities were not protected under *Pickering*") and *Morfin* (which, it noted, reversed a grant of summary judgment on a union association claim "without applying the public concern test"), then explained:

> In these cases, we offered no lengthy explanation for not applying the public concern test, but we did emphasize the self-imposed character of the collective-bargaining agreement. . . . Where a public employer has negotiated with an employee union and signed a collective-bargaining agreement, it has contractually agreed to the legitimacy of the union and of its employees' association with the union.  The public employer has presumably received the benefit of its bargain and is estopped from claiming that its 'interests as an employer' are inconsistent with the freedom of its employees to associate with the union or to file grievances in accordance with its procedures. [Citing *Butcher* for the proposition that "once a public employer signs a collective bargaining agreement," it no longer has a legitimate interest in its employees' union activities.]  If a public employer retaliates against an employee for engaging in acts protected by the collective-bargaining agreement – as Officer Shrum alleges here – then the employer cannot rely on the [*Connick*] test to avoid First Amendment scrutiny.

*Id.* at 1139.  In instructing the trial court on remand, the 10th Circuit stated "the district court should [not] require 'public concern' . . . The City of Cowetta already balanced [that] interest[ ] when it agreed to a collective bargaining agreement.  The Defendants are estopped from reneging on this agreement . . . by claiming that union association is not a matter of public concern."  *Id.*

 The Court pauses here to consider the import of *Shrum*.  *Shrum* appears to announce a categorical rule that the "public concern" test should not be applied when a public employee asserts retaliation for his association with a union.  But it appears that the rule is premised upon the finding that employer has entered into a collective bargaining agreement with the union.  This suggests that the court either: (i) believed that by entering into such an agreement, the public employer had somehow acknowledged that the union's activities are of public concern and therefore it is "estopped" from contending otherwise, or (ii) the court conflated the *Pickering* balancing and the *Connick* "public concern" test.[5]  This Court is forced to concede that it is

_____

[5] The *Pickering* balancing test is one of the components analyzed in conjunction with a claim of retaliation for engaging in free speech.  *See, e.g., Worrell v. Henry*, 219 F.3d 1197, 1205-06 (10th Cir. 2000).  The court must consider whether: (i) the speech (or First Amendment activity) addresses a matter of public concern (what this Court has heretofore called the "*Connick* test"); (ii)  the employee's interest in free expression outweighs the employer's interest in restricting the speech ("the *Pickering* balancing"); (iii) the speech was a substantial or motivating factor in the challenged governmental action; and (iv) the employer can show that it would have taken the same action even in the absence of the employee's protected speech.  *Id.*

 The passage from *Shrum* quoted above appears to merge the first two components – the *Connick* "public concern" test and the  *Pickering* balancing of employer vs. employee interests.  The bulk of the quoted passage suggests that, by entering into a collective bargaining agreement with the union, an employer can be viewed to have conceded the *Pickering* balance as to union activities.  In other words, once the employer recognizes and bargains with the union, it is deemed to have admitted that its interest in being able to squelch union activity in order to maintain efficient operations is subordinate to the employees' ability to participate in union activities (*e.g.* to enforce the terms of the collective bargaining agreement).  If the quoted passage from *Shrum* limited itself to finding that union activity in a collective bargaining

unable to comfortably proclaim a full understanding of the scope and reasoning behind the conclusion in *Shrum*.

Without claiming to have unraveled the mystery, this Court observes that *Shrum*'s exception – that associational claims based on union activities need not demonstrate public concern under *Connick* – depends upon the employer having recognized the union and entered into a collective bargaining agreement with it. Indeed, the court "emphasize[s] the self-imposed nature of the collective-bargaining agreement," making clear that any estoppel effect arises from the fact that the employer "negotiated with an employee union and signed a collective-bargaining agreement," and that the City had abandoned any right to invoke the "public concern" issue "when it agreed to a collective bargaining agreement." Thus, to the extent *Shrum* dispenses with the *Connick* "public concern" test in situations involving association for purposes of union activity, this Court is prepared to say that it does so only in circumstances where the public employer has recognized and entered into a collective bargaining agreement with the union.

Finally, this sets the stage for a return to the recent decision in *Merrifield*. As discussed previously, *Merrifield* sets forth a general rule that claims based on functional association rights

_____

environment always survived the *Pickering* balancing, it might avoid criticism.

But as the first sentence of the quoted passage implies, the court was apparently finding that entry into a collective bargaining agreement also conceded the *Connick* "public concern" showing. (To the extent that one might read the first sentence of the quoted passage as an inelegant transition into a discussion of only the *Pickering* balancing or mere surplusage, the instruction to the trial court on remand makes clear that it is not to reconsider the "public concern" question. *Id*. at 1139.) *Shrum* does not explain why the Court believed that collective bargaining activities necessarily implicated issues of public concern; indeed, such notion is contrary to *King*, in which the court had expressly noted that "an employee's speech or activity does not touch on a matter of public concern merely because it is union-related." 58 Fed.Appx. at 833 n.1.

require the employee to prove that the association furthered issues of public concern. *Merrifield* expressly rejected the employee's contention that "Tenth Circuit precedent requires rejection of the public-concern requirement in this context." In doing so, the court referred to *Butcher* and *Morfin*, but found them inapposite as they did not "discuss whether the public-concern requirement would apply to association-based retaliation claims." *Id.* at 1084. As the discussion above makes clear, this observation is correct.

Then, *Merrifield* addresses the court's reasoning in *Shrum*. It uses *Shrum* to illustrate that "for some time we have recognized that the issue we are deciding today [that is, application of the "public concern" test in associational cases] has been open in this circuit." *Id.* at 1084. But it also notes that in *Shrum*, "in the specific context of public-employee labor unions, we have rejected the requirement that a worker demonstrate that his association with the union be a matter of public concern." *Id.*

As stated above, the Court understands *Shrum* to eliminate the "public concern" test only with regard to associational claims relating to union activities where the employer and union have reached a collective bargaining agreement. An argument could be made that *Merrifield*'s language should be read to expand that rule to apply to **any** union-based associational claim, but this Court is not inclined to assume that *Merrifield* was purporting to do so in such an indirect way. *Merrifield* did not involve facts relating to union activity, and thus, there would be no need to expand the union-activity rule of *Shrum*. Moreover, it is clear from the context of *Merrifield* that the court was acknowledging *Shrum* as an exception to its observation that the issue of applicability of the "public concern" test to associational claims was an open question.

Accordingly, this Court does not read *Merrifield* as expanding a narrow exception created in *Shrum*.

Having now completed its survey of precedent, the Court returns to the question that prompted it: if the general rule of *Merrifield* requires an employee to prove that his association furthered a public concern, is there a special exception when the associational activity is to organize or assist a union? The preceding discussion should make clear that the answer to that question is, due to *Shrum*, "yes, but only where a collective bargaining agreement is in place."

Admittedly, at least one judge of this Court has reached a contrary conclusion. In *Blangsted v. Snowmass-Wildcat Fire Protection Dist.*, 2008 WL 4411440 (D. Colo. Sept. 16, 2008) (slip op.), Judge Miller addressed facts similar to those presented here – a public employee alleged that he suffered retaliation for associational activities on behalf of a union, but no collective bargaining agreement was in place. Addressing a claim of qualified immunity, Judge Miller noted that "there does . . . remain a question as to whether the first *Pickering* element, matter of public concern, applies in freedom of association cases" (citing *Shrum*), and "relatedly, [a question of] whether an activity meets the public concern element merely because it is union related" (citing *King*). Judge Miller noted the fact that the First Amendment protects the right of a public employee to join a union, citing *Morfin*, and acknowledged that the exception set forth in *Shrum* was limited to cases where collective bargaining agreements were in place. Nevertheless, he found that "the right to engage in activity of organizing a union is itself protected by the First Amendment without the necessity of a court determination that any particular activity of that union is a matter of public concern," citing to both *Shrum* and a passage in *Morfin* that acknowledged that First Amendment's association right protects an

employee's right to join a union.  Judge Miller was particularly reluctant to engage in a public

concern analysis, believing that this "would inevitably require a determination of the worth of a

particular union [and] whether [the court] view[s] the union as 'good' or 'bad.'"  He rejected the

employer's argument that *King* was dispositive, finding *King* to be factually distinguishable

because there, the employee's bringing of identical speech and associational claims warranted

"the full *Pickering* analysis."  Thus, he concluded that the "the right to participate in a union was

clearly established" and the employer was not entitled to qualified immunity.

Although this Court respects the analysis of Judge Miller in *Blangstead*, it is compelled

to disagree.[6]  Specifically, this Court disagrees that the question of whether the "public concern"

test applies can be dispensed with simply by acknowledging that the First Amendment protects

the employee's right to associate with a union.  Such a holding would turn the "public concern"

---

[6]      This Court does share one concern with *Blangstead*: the generalized apprehension that
would accompany courts having to examine the purposes of an employee's union activities in
order to ascertain whether those purposes implicate matters of public concern.  But this Court's
reservations are not those articulated in *Blangstead*.  Rather, this Court's concern is that the
"public concern" inquiry may misdirect attention to the union's motivation as a proxy for its
social utility.  Simply because employees wish to bargain collectively to enhance their own
private economic prospects, rather than to advance some broader issue of public import, makes
their endeavor no less "good" or "worthwhile" than more publicly-focused purposes.

This Court's reservations are more practical, recognizing the difficulties in how proof of
the purposes underlying an employee's union activities can be had.  Indeed, such an examination
would seem to promise potentially conflicting results.  Imagine two public employees, identical
in every respect, are terminated for having agreed to join a union.  If the first employee's
motivations for joining the union were purely private, while the second employee's motivations
were motivated by concerns shared with the general public, only the latter would have an
actionable claim.

Although the Court is concerned in the abstract about how the "public concern" test
could be applied to issues such as an employee's motivations for engaging in union activity, such
concerns do not give it license to disregard what appear to be the clear teachings of cases like
*Connick*, *Merrifield*, and *Shrum*.  To the extent that the current analytical paradigm is impractical
or ineffective, it is not within this Court's power to dictate a different one.

test on its head.  If First Amendment protection of an activity is all that is necessary to avoid the "public concern" filter, then *Connick*'s filter disappears entirely, as First Amendment protection runs to speech that is purely of private concern.  *Connick*, 461 U.S. at 147 ("We do not suggest, however, that Myers' speech, even if not touching upon a matter of public concern, is totally beyond the protection of the First Amendment").

The reasoning of *Blangstead* would also conflict with *Merrifield*'s holding that although association with an attorney can be protected as a First Amendment right, the employee nevertheless still had to demonstrate that such association also served a public concern.  654 F.3d at 1081.  In addition, the reasoning of  *Blangestead* would eliminate the need for and the limitation of *Shrum*.  Finally, the reasoning of *Blangestead* ignores the observation in *King* that union activities do not, simply because they involve a union, inherently satisfy the "public concern" standard.  58 Fed.Appx. at 833 n. 1.

Ultimately, this Court concludes that Mr. Cillo, and any public employee asserting an associational claim premised upon union activity – at least union activity that has not resulted in a collective bargaining agreement – must satisfy the "public concern" test for largely the same basic rationale as that stated in *Merrifield*.  The central premise of that decision is that the First Amendment analysis applied to associational rights should be roughly congruent with the First Amendment analysis that would apply to the acts that association was intended to permit.  654 F.3d at 1082-83.  Had Mr. Cillo simply walked into the Command Staff's office by himself and demanded higher pay or a change in promotional procedures and suffered retaliation as a result, the *Connick* "public concern" test would indisputably apply to his retaliation claim.  There is no

reason why it should not similarly apply when Mr. Cillo associates with others in order to achieve the same result.[7]

Accordingly, the Court finds that Mr. Cillo is required to demonstrate, as an element of his § 1983 retaliation claim, that his union activities were addressed toward a matter of public concern.

### c. Whether Mr. Cillo's association touched on a matter of public concern

A matter is one of public concern where it relates to "any matter of political, social, or other concern to the community"; that notion is juxtaposed with an action that is "only of personal interest" to the employee. *Connick*, 461 U.S. at 146-47. This assessment must be made "by the content, form, and context" of the activity in question. *Id.* at 147-48. Matters of public concern are those that are "subject[s] of legitimate news interest; that is a subject of general interest and of value and concern to the public." *City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004). The Court focuses on the motive of the actor in an attempt to determine whether the association was "calculated to redress personal grievances or whether it had a broader public purpose," such as "sufficiently inform[ing] the issue as to be helpful to the public in evaluating the conduct of government." *Gardetto v. Mason*, 100 F.3d 803, 812 (10th Cir. 1996); *see also Craven v. Univ. of Colorado Hosp. Auth.*, 260 F.3d 1218, 1226-27 (10th Cir. 2001) ("[i]n deciding whether a particular statement involves a matter of public concern, the fundamental inquiry is whether the plaintiff speaks as an employee or as a citizen"). Thus, "speech pertaining

---

[7]     The Court readily recognizes that there may be public policy justifications for favoring concerted action over individual action and thereby granting an associational claim more protection in such circumstances. But the Plaintiffs have not presented such an argument and, more importantly, have not pointed to any caselaw in which courts have adopted such justifications.

to internal personnel disputes and working conditions ordinarily will not involve public concern," whereas "speech that seeks to expose improper operations of the government or questions the integrity of governmental officials" does.  *Id.*

Most importantly, however, the question of whether the employee's speech or association bears on a matter of public concern is assessed from the perspective of the **employer**.  In *Waters*, 511 U.S. at 677-78, the Supreme Court made it clear that the *Connick* test was applied based on "the facts as the employer reasonably found them to be."  *Id.* (emphasis in original).  In other words, this Court must first consider the types of procedures that a reasonable employer would use in investigating and ascertaining the relevant facts of a situation, and assess the *Connick* "public concern" test in light of the facts that would be known to the employer under such a situation.  *Id.* at 677-78.

The Court need not extensively review the evidence in the record on this point. Deposition testimony from Mr. Harvey and Mr. Perry, officials in the police department, indicates that they understood that the IUPA's goals (and thus Mr. Cillo's goals in associating with others to form the IUPA) included, among other things, seeking raises and increased benefits to police officers to more closely match wages and benefits in nearby jurisdictions and a request that police officers be allowed to engage in collective bargaining.[8]  Although success on these issues would have inured to the personal benefit of employees like Mr. Cillo, the mere fact that he would have privately benefitted does not preclude the issues from also being matters of public concern.  *Davignon v. Hodgson*, 524 F.3d 91, 101-02 (1st Cir. 2008).

---

[8]      The record seems to indicate that authorization for collective bargaining required legislative approval, but taking the facts in the light most favorable to Mr. Cillo as nonmovant, it is reasonable to infer that the IUPA would ultimately press for such authorization.

This Court concludes that issues of pay parity with nearby jurisdictions and the question of whether public employees should be given the right to bargain collectively are issues that go beyond purely private interests and touch on matters of genuine public concern. *Id.*; *see also Abad v. City of Marathon*, 472 F.Supp.2d 1374, 1379-80 (S.D. Fl. 2007) (employee's newspaper editorial complaining that quality of firefighting services was imperiled by "below average annual wages" addressed matter of public concern). The Court acknowledges that the call is a close one, as neither Mr. Cillo nor the IUPA appears to have directed their communications towards the community as a whole, nor did they assert particularly that pay disparities were compromising the department's services. *Compare, e.g., Balton v. City of Milwaukee*, 133 F.3d 1036, 1040 (7th Cir. 1998) (employees who claimed they received bad performance evaluations in retaliation for their refusal to pay union dues, which refusal was caused by the employees' dissatisfaction with union's inability to secure better pay for them, failed to demonstrate their (non-)association with union implicated issue of public concern). Nevertheless, taking the evidence in the light most favorable to Mr. Cillo, the Court finds that his union activities touched, at least in part, on matters of public concern.

Accordingly, the Court finds that he has demonstrated a genuine dispute of fact with regard to the first element of a §1983 retaliation claim.

2. Adverse action

Initially, Mr. Cillo appeared to allege that he was subjected to a variety of adverse employment actions, including removal of certain job assignments and "rotations" to less-desirable working groups. However, as the Court reads his summary judgment response, Mr. Cillo has disclaimed any intention of alleging that those incidents constitute separately-

actionable adverse employment actions.  *Docket* # 41 at 46 ("The only adverse action for which

Sgt. Cillo seeks a remedy is the illegal termination of his employment"; the other events "are

simply examples of discriminatory actions taken by Defendants that support an inference that his

termination was motived" by anti-union bias).  Thus, the Court finds that Mr. Cillo has identified

a single adverse employment action he claims to have suffered as a result of retaliation – his

termination from employment.

### 3.   Substantially-motivated by union activity

Mr. Cillo next has the burden of demonstrating that the Defendants' decision to terminate

him was "substantially motivated" by his association with the union.

When the element of substantial motivation arises, as it does here, on a summary

judgment motion that simultaneously invokes the doctrine of qualified immunity, the Tenth

Circuit has provided a modified analytical approach to be used.  *McCook v. Spriner School Dist.*,

44 Fed.Appx. 896, 905-06 & n.5 (10th Cir. 2002) (unpublished), *citing Gehl Group v. Koby*, 63

F.3d 1528, 1534 (10th Cir. 1995).  First, the Defendants must make a *prima facie* showing of the

objective reasonableness of the challenged conduct, and then Mr. Cillo has the burden of

presenting evidence that the Defendants "acted on the basis of a culpable state of mind." *Id.*

The basic factual contours of the event that led to Mr. Cillo's termination are not in

particular dispute.  On June 9, 2009, several Greenwood Village police officers were summoned

to a Motel 6 to investigate a claimed sexual assault.  Mr. Cillo and another officer, Sgt.

Wrobleski, were the ranking officers on the scene.  The victim was no longer at the scene, but it

was believed that the suspects were hiding in their motel room, and one of them was believed to

be in possession of a handgun.  Officers, including Mr. Cillo and Sgt. Wroblewski, assembled

outside that room.  They knocked on the door but received no response.  One of the officers

obtained a passkey from the motel management and used it to open the door, but an interior lock

prevented the door from opening completely.  One of the officers prepared to kick in the door,

but one of the suspects came to the door, unhooked the latch, and opened the door.  At that point,

officers swarmed into the room, despite not having obtained the suspect's consent or having a

factual basis to otherwise enter the room without consent.  The suspect failed to immediately

comply with officers' orders to lie on the ground and show his hands, so one officer used the

muzzle of his rifle to force the suspect onto the bed.  Both suspects were then arrested.[9]

After the event, Mr. Harvey conducted an investigation of the event, reviewing reports

and speaking to all of the officers involved.  During his meeting with Mr. Harvey, Mr. Cillo

acknowledged that, as the most experienced officer on the scene, he considered himself to be in

command.  He conceded that it was contrary to police training to obtain a passkey in order to

enter a hotel room (although he contended to Mr. Harvey that he did not believe the suspects had

standing to object to the entry because they were not the ones who had initially rented the room).

In general, Mr. Cillo acknowledged that mistakes had been made in the incident (including his

own mistakes in various aspects as supervising officer).

At the conclusion of that investigation, Mr. Harvey recommended that all of the officers

involved receive some form of discipline.  With regard to Mr. Cillo and Sgt. Wroblewski, Mr.

Harvey found them both to be ultimately responsible for the mistakes made in the incident and,

worried about potential negligent supervision claims in the future, recommended that they both

---

[9]      Ultimately, the suspects raised a Fourth Amendment issue regarding their arrest and,
upon reviewing the facts, the District Attorney conceded that their seizure occurred unlawfully
and dismissed the charges.  However, these events occurred after Mr. Cillo was terminated, and
thus, do not materially bear on the analysis herein.

be terminated.  He also recommended termination of the officer who attempted to enter with the passkey and used his weapon to subdue one of the suspects, as well as for another officer involved in the initial entry.  He recommended that two other officers be put on "decision making leave" until they agreed to "sign a Letter of Last Chance" in order to preserve their employment, and he recommended that four others be given lesser forms of discipline.

Mr. Perry received Mr. Harvey's recommendation and discussed it with other members of the Command Staff.  Although some members of management thought that termination was too severe for Mr. Cillo, given his experience, disciplinary record, and acceptance of responsibility, Mr. Perry ultimately adopted Mr. Harvey's recommendation and gave Mr. Cillo notice that the department would be seeking his termination.  Mr. Cillo appeared at a pre-termination hearing and supplied a written statement.  Although the statement alleges that other instances of comparable misconduct by other officers did not result in termination, it does not make any allegations of anti-union animus.  After the hearing, Mr. Perry concluded that termination was appropriate and discharged Mr. Cillo.  Mr. Cillo filed a prompt appeal and, now represented by counsel, raised for the first time a contention that his termination was the result of retaliation for his union activity.  Mr. Cillo's appeal was heard by Mr. Sanderson, as City Manager of Greenwood Village, but Mr. Sanderson concurred in the decision, thus rendering it final.

On these facts, the Court finds that the Defendants have carried their burden of demonstrating a *prima facie* non-retaliatory justification for Mr. Cillo's termination.  It is essentially undisputed that Mr. Cillo was effectively, if not necessarily formally, in charge of an operation in which several police officers subject to his control and direction engaged in several

22

different acts inconsistent with their training and reflecting either ignorance, a misunderstanding, or a deliberate disregard of the Fourth Amendment's protections.  This is sufficient to carry the Defendant's burden.

The Court then turns to the question of whether Mr. Cillo can carry his burden of coming forward with facts that would show that the Defendants acted with an intent to retaliate against Mr. Cillo because of his union activities.  The parties have addressed this issue in extensive factual detail.  This Court will not endeavor to discuss each factual contention, much less the parties' many arguments over whether a given contention is disputed or what its significance is.

The crux of the matter is that Mr. Cillo has not come forward with any facts suggesting any particular anti-union **animus** on the part of any Defendant.  He has, to be sure, pointed out that the Defendants did not necessarily agree with him that the IUPA was necessary, that collective bargaining was the right course of action for the department, or that the issues that Mr. Cillo and the IUPA considered important were indeed worthy of attention.  But there is no particular evidence that meaningfully suggests that this disagreement transcended the boundaries of a simple difference of opinion and rose to a level that the Defendants felt the need to act against Mr. Cillo based on their disagreement.  He does not, for example, point out any threats, express or even implied, that any Defendant made to him in an attempt to dissuade him from pressing the union's cause[10]; describe the Defendants ever using particularly disparaging

---

[10]     A representative illustration of the type of evidence Mr. Cillo presents, and the inferences he draws from it, is the hotly-contested affidavit of Jeanette Harvey, Mr. Harvey's ex-wife. Putting aside the parties' wrangling over the admissibility of this exhibit, the affidavit recites that in or about August 2007, Ms. Harvey and her husband had "several weeks" of discussions about whether or not he should join the newly-created IUPA.  The affidavit states that one day, after having had a discussion with Mr. Sanderson and Mr. Perry – a discussion that neither the

language about the union; or characterize any of the discussions he had with the Defendants (or others) about the union as being unusually heated or emotional.  This Court is not prepared to say that simply because the Defendants did not share Mr. Cillo's belief that a union was necessary for the police department, a reasonable juror could thus infer that Defendants retaliated against him for having such a belief.  By analogy, imagine a hypothetical situation where Mr. Cillo was a Republican and that the Defendants were Democrats, and that the two sides had engaged in occasional, but always civil, disagreements about political matters.  The mere fact of

---

affidavit nor any other evidence in the record elucidates – Mr. Harvey told Ms. Harvey that he had decided against joining the union because it "wouldn't be in the best interests of my career [and his intentions on someday being promoted to management] to join the union."  She further states that she later overheard a telephone call between Mr. Harvey and a co-worker in which Mr. Harvey spent half an hour "persuading [the co-worker] not to join the union by telling him it wouldn't be good for his career to do so."

Mr. Cillo cites to the affidavit as evidence of Mr. Sanderson and Mr. Perry's anti-union animus.  Admittedly, if one engages in what the Court refers to as "reasoning backwards" (students of logic might know the practice as the fallacy of "begging the question") – that is, starting with a conclusion that Mr. Sanderson and Mr. Perry harbored anti-union animus and then examining whether one could conceive of a scenario that would fit the facts to that conclusion, one might infer that Mr. Sanderson and Mr. Perry threatened Mr. Harvey's prospects for promotion if he decided to join the union.

But when one reasons forwards, evaluating the evidence objectively and drawing reasonable inferences from it, one cannot reach that same conclusion without engaging in an undue amount of speculation.  The evidence simply demonstrates that Mr. Harvey was indecisive about whether he should join the union, he sought counsel from Mr. Sanderson and Mr. Perry, and that counsel (the contents of which we know nothing about) led Mr. Harvey to decide not to join the union.  One could speculate endlessly about what the conversation entailed – possibly threats, but also possibly an objective discussion of the substantive merits of the union's positions on issues; discussion of concerns (or even petty ridicule) about the personality traits of union organizers and supporters (*e.g.* "I don't think X, the treasurer, is trustworthy," or "Y, the secretary, has a problem with jealousy and is likely to use his office to pursue personal vendettas") that might reflect poorly on other union members; genuine belief in rumors or propaganda that had cast the union in a bad light; discussion of a shared belief that **other** City officials (or the voting public) might indulge in anti-union animus; and so on – but speculation is all it would be because Ms. Harvey's affidavit lacks the necessary specifics as to both the substance of the conversation and the meaning of Mr. Harvey's statement that joining the union would not be "in the bests interests of [his] career."

their different opinions does not permit an inference that, if Mr. Cillo was thereafter fired, the termination could be thus be inferred to have been as a result of Mr. Cillo's political leanings. *See, e.g., Gritton v. Disponett*, 332 Fed.Appx. 232, 240-41 (6th Cir. 2009) (unpublished).

Mr. Cillo also draws inferences from what he contends is disparate discipline that was administered more harshly against union members than against non-union members. Certainly, proof that an employer imposed discipline more harshly against one group than another can be circumstantial evidence of a discriminatory or retaliatory motive, but that inference is available only where the situations are genuinely comparable – that is, where the situations involved the same supervisor, occurred under the same standards of performance and discipline, and involved conduct of comparable seriousness. *Lollis v. City of Eufaula*, 249 Fed.Appx. 20, 26 (10th Cir. 2007) (unpublished), *citing McGowan v. City of Eufala,* 472 F.3d 736, 745 (10th Cir. 2006); *EEOC v. PVNF, LLC*, 487 F.3d 790, 801 (10th Cir. 2007).

In this sense, Mr. Cillo gains little from contending that, with regard to the Motel 6 incident, Officer Williams, the only non-member of the union, received lighter discipline.[11]  Mr.

---

[11]     An affidavit from Mr. Harvey indicates that, when he was conducting his investigation and recommending discipline, he was unaware of whether Mr. Williams was a member of the union or not. Mr. Cillo argues in his summary judgment response that this fact is disputed and that Mr. Harvey knew of Mr. Williams' lack of union affiliation. In support of this contention, he cites to three items of evidence.

The first item is a paragraph of Mr. Harvey's affidavit, which states that Mr. Harvey eventually learned of Mr. Williams' non-affiliation with the union "through the course of this litigation."

The second item is Mr. Williams' deposition, in which Mr. Williams responded to a question of whether **he** knew that **Mr. Harvey** was a member of the FOP [the Fraternal Order of Police, an existing and popular police employee association that had some, but not all characteristics of a union and was arguably a rival to the IUPA]. Mr. Williams was quite equivocal; within the course of a five-sentence answer to the question, Mr. Williams stated on one hand that "I guess I didn't know for sure if he was or not," stated on the other hand that "you kind of knew who was in the union . . . just based on working with everyone," and then threw up both hands and conceded that "he could have been in the union and I wouldn't have even

Williams' role in the incident primarily consisted of preparing to kick in the door after being instructed to do so by another officer.[12] (Mr. Williams stated in an interview with Mr. Harvey that he did not believe that a forced entry was warranted, but assumed that the officers instructing him to do so had more information about the situation than he had.) Mr. Williams is not alleged to have engaged in "conduct of comparable seriousness" to that of Mr. Cillo; Mr. Williams was not understood to be responsible for commanding the team effecting the entry, as Mr. Cillo was; and Mr. Williams' mistakes during the incident were relatively minor and largely done at the direction of others. The proper comparator to Mr. Cillo for purposes of this event was Mr. Wroblewski, who was also understood to be responsible for commanding the situation and thus, was also ultimately culpable for the various mistakes made during the incident. Mr. Wroblewski received precisely the same discipline that Mr. Cillo did. The fact that Mr. Wroblewski was also a member of the union thus does not support Mr. Cillo's argument that some inference of anti-union animus can be drawn from the manner in which discipline was meted out for the Motel 6 incident.

---

known." Mr. Williams was subsequently asked whether Mr. Harvey knew Mr. Williams was in the **FOP**, and Mr. Williams responded that "I'm sure he did [because of] just the same– same circumstance, we all worked together. I assume he knew who was union and who was FOP." (The Court notes that there was no restriction on the ability of officers to be members of **both** the FOP and the union; Mr. Wroblewski, for example, is alleged to have been a member of both.)

   The third item is Mr. Cillo's own affidavit, in which he states only that "Lt. Harvey and Ofc. Matt Williams had a close relationship" and that they spoke to each other often.

   On this record, the Court cannot say that Mr. Cillo has demonstrated a genuine dispute of fact as to whether Mr. Harvey was even aware of Mr. Williams' affiliation or non-affiliation with the union at the time he recommended discipline for the Motel 6 incident.

[12]    Mr. Cillo points out that Mr. Williams was one of the individuals who obtained one of two motel passkeys that were used in attempts to unlock the door. However, Mr. Harvey's report from the investigation into the incident indicates that Mr. Williams stated that he obtained the key upon instruction to do so from another officer on the scene.

Mr. Cillo also argues that the department did not administer such harsh discipline in prior situations in which police officers committed conduct amounting to Fourth Amendment violations. The Court will not recite these instances in particular detail, as it finds all of them unavailing. Some, such as an incident with Mr. Wroblewski occurring in 2006, are inapposite both because of their age (the 2006 incident occurred prior to Mr. Harvey and Mr. Perry occupying their current management positions, although Mr. Perry, then a Lieutenant, did write up Mr. Wroblewski for the incident and submit that report to his superiors). Moreover, to the extent that the circumstances of each of these events are even discernable from the record, all of them are inapposite because of their lack of similarity to the Motel 6 incident. For example, the 2006 incident involving Mr. Wroblewski apparently involved Mr. Wroblewski getting involved **after the fact** in an incident in which an officer under his supervision apparently engaged in an unlawful entry of a motel room and executed an arrest, but did so when Mr. Wroblewski was not physically present. *Docket* # 41, Ex. 56 at 4 (he "responded after the issue had been discovered [and] did his best to attempt repairs of a failed application of search and seizure"). This Court cannot say that a situation in which an officer was held responsible for unlawful actions occurring outside his presence is comparable to the Motel 6 incident, where Mr. Cillo was physically present at the time of the unlawful conduct and had the ability to control and prevent that conduct. Similarly, the "Roundtree incident" in 2008, in which no officer was disciplined following a situation during a standoff with a disturbed individual that resulted in officers mistakenly firing beanbags at the individual and then unlawfully entering his home, is not comparable. The Roundtree incident was the result of a miscommunication between the supervisor on scene and the officers about how the situation should be handled and there is no

suggestion that the commands given by the supervisor, if properly followed, would have been improper. On the other hand, the Motel 6 incident involved Mr. Cillo failing to take any action in a situation in which his leadership and intercession was necessary to prevent officers from engaging in an intended use of force that was clearly unlawful. Thus, the Court cannot say that Mr. Cillo has demonstrated disparities in the discipline imposed in comparable situations such that an inference of anti-union animus underlying his own termination can be drawn.

Finally, Mr. Cillo points to various other situations in which the Defendants transferred him into less-prestigious assignments after he began his union activities as evidence of their animus. Mr. Perry has submitted an affidavit stating that the purpose of these transfers was to broaden Mr. Cillo's areas of experience in order to make him more suitable for promotion and to expose other officers to the assignments previously held by Mr. Cillo. (Mr. Cillo's response is somewhat cagey in stating that the transfers "may or may not have [had] that effect" and he borders on misstating the record when he points to Mr. Perry's deposition testimony as supporting the contention that he "was not rotated to Detectives in order to make him more promotable."[13]) Mr. Perry's affidavit states that he did the same thing with Mr. Harvey in the

---

[13] The excerpt from Mr. Perry's deposition that Mr. Cillo cites in support of this contention reads as follows:

> Q: So promotion didn't have anything to do with the reason for rotation, it was just to increase people's base of experience?
>
> A [by Mr. Perry]: To broaden their knowledge, yes sir.
>
> Q: Not to put them in a better position to be promoted?
>
> A: Well, when you increase your knowledge base, it puts you in a better position, or at least that's part of it, put them in a better position. . . .

past, as well as other officers.  Mr. Cillo's argument that his transfers reflect anti-union animus largely stems from the fact that he liked his previous assignments, and that he felt that the transfers "made no business sense."  But neither of those arguments defeats the fact that the Defendants are vested with the discretion to assign work as **they** see fit, regardless of whether an employee likes or dislikes the decision.  Ultimately, the Court finds that the contribution that this evidence makes to an inference that Mr. Cillo's termination was motivated by anti-union animus is so diffuse and indirect as to be meaningless.

Accordingly, the Court finds that Mr. Cillo has not come forward with evidence that creates a genuine issue of fact as to whether the Defendants' decision to terminate him was motivated by animus against him for associating with the union.  Accordingly, the Defendants are entitled to summary judgment on his § 1983 claim.  The Court need not reach the parties' remaining arguments on this claim.

### C.  Remaining Claims

From its review of the parties' submissions, it appears to the Court that Mr. Cillo's remaining claims – violation of the Colorado statute prohibiting discrimination based on an employee's off-duty activities and tortious interference with contract – depend on the premise that Mr. Cillo's termination was based on animus against him for engaging in union activity.  (It is the central theory of the statutory claim and the fact that renders "improper" any alleged interference by the Defendants with his contract of employment with Greenwood Village.)  Because the discussion above explains that Mr. Cillo has failed to present a genuine dispute of fact as to whether his union activities motivated the Defendants' decision to terminate him, the Defendants are entitled to summary judgment on these claims as well.

### D.  Requests to Restrict Access

Finally, the Court turns to the parties' motions to restrict access **(# 35, 40, 45)** to the summary judgment filings in this case.  In each motion, the grounds stated for seeking restricted access consist of the following: (i) the parties have designated the evidentiary materials as "confidential" under a Protective Order during discovery[14]; (ii) the motion papers and exhibits make reference to "personal and private information of third parties, such as the union affiliation, disciplinary records, and internal affairs investigation files" of various current and former police officers, including non-parties; (iii) that non-parties have a heightened privacy interest in matters concerning their employment, lest it "lead to embarrassment and damage to [their] reputations"; and (iv) that the IUPA "has consistently taken a position against the revelation of union membership" and that revealing such information has a chilling effect on employees' First Amendment rights to freedom of association.[15]  The motions contend that "redaction of names, types of discipline, union affiliation, and other Confidential information is simply not feasible given the interwoven nature of these facts to Plaintiffs' claims," and thus seek to seal the entirety of the motion papers and all supporting exhibits.

The Supreme Court acknowledged a common-law right of access to judicial records in *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597 (1978).  This right is premised upon the recognition that public monitoring of the courts fosters important values such as respect for the legal system.  *See In re Providence Journal Co.*, 293 F.3d 1, 9 (1st Cir. 2002).  Judges have a

---

[14]     D.C. Colo. L. Civ. R. 7.2(B)(2) makes clear that such designations have little intrinsic significance to the analysis.

[15]     The irony that the IUPA is a Plaintiff in this action, that it readily reveals the union affiliations of numerous employees as part of its briefing, and indeed, that it frequently argues that such union affiliations were common knowledge in the workplace, is not lost on the Court.

responsibility to avoid secrecy in court proceedings because "secret court proceedings are anathema to a free society." *M.M. v. Zavaras*, 939 F. Supp. 799, 801 (D. Colo. 1996). There is a presumption that documents essential to the judicial process are to be available to the public, but public access may be restricted when the public's right of access is outweighed by interests that favor nondisclosure. *See United States v. McVeigh*, 119 F.3d 806, 811 (10th Cir. 1997). It is within the district court's discretion to determine whether a particular court document should be restricted. *See Nixon,* 435 U.S at 599. The public interest is particularly significant where the materials for which restriction is sought are fundamental to the Court's decision-making process, as it is critical that the public be able to review the factual basis of this Court's decisions and evaluate the Court's rationale so that it may be confident that the Court is functioning as a neutral arbiter. *McVeigh*, 119 F.3d at 814.

Here, the Court finds that wholesale restriction of the motion papers and the exhibits is not warranted. As the discussion above makes abundantly clear, issues of employees' union affiliations and disciplinary records are central to the issues in this case. As a result, the public interest in having access to those records – both the briefs that set forth the parties' arguments and the exhibits that support those arguments – is particularly high, given the public's right to be able to independently assess the propriety of the Court's decision. Although the Court agrees that employees – particularly non-party employees – have privacy interests in not having their disciplinary records or union affiliations unduly exposed to public scrutiny, the Court cannot say that those privacy interests trump the strong public interest at play here. The key word in the preceding sentence is "unduly": in a suit contending anti-union animus arising from employee discipline, it is inevitable that issues of union affiliation and prior discipline of non-parties will

be essential to the proof.  In that regard, although the Court finds it unfortunate that non-parties'

names get dragged into the litigation, it is an unavoidable consequence of a public judicial

system.

At the same time, the Court observes that the parties have apparently chosen to err on the

side of over-inclusiveness, rather than under-, in presenting their arguments, and as a result, the

briefs and exhibits discuss many employee names and incidents of discipline whose relevance or

probative value to the issues presented here are remote.  Incidents in which employees were

disciplined for engaging in sexual harassment or verbally abusing citizens, among other things,

are clearly inapposite to the type of misconduct at issue here, and are of such remote relevance

(if relevant at all) to the issues in dispute that they should probably never have been included in

the briefing in the first place.  Nevertheless, that material appears in the record and the briefs,

and the Court is not inclined to restrict public access to motion papers simply because the parties

have chosen to include such material within it.

The parties have presented the Court with an "all-or-nothing" choice regarding restricting

access to the motion papers.  Although their motions to restrict access address the unsuitability

of redaction as an alternative, they have not addressed other possibilities expressly discussed in

Local Rule 7.2(B)(4).  That is unfortunate.  The rule was drafted to expressly prompt the parties

to consider a wide range of approaches to dealing with sensitive material, in the hopes that

motions seeking to restrict access would be rare.  Here, counsel who recognized the strong

public interest afoot here might have avoided identifying certain non-party employees and their

disciplinary records through a variety of techniques, including the use of pseudonyms,

stipulations as to undisputed facts, summarization of records and deposition transcripts instead of

submission of the originals, etc.   The Court readily recognizes that creative attempts by parties to ameliorate the need for motions to restrict access are time-consuming, require negotiation, and seem burdensome when the parties are in agreement that restriction is faster and easier. Nevertheless, it is the Court's experience that parties tend to inherently undervalue the public's interest in access to judicial records and thus, undervalue the salutary effect of making such efforts.

Accordingly, the Court finds that the bulk of the parties' submissions are such that the public interest in access outweighs any private interest in confidentiality, and for that reason, the motions to restrict access are denied.   Although the Court finds that some of the exhibits and references in the briefing involve matters where the private interests in non-disclosure are relatively high and the public interest in access is relatively low, those instances are in the minority and do not warrant the wholesale restrictions the parties request.   If the parties have the inclination and ability to prepare a more targeted motion that precisely identifies the most compelling situations in which private interests outweigh the public interest is a question, the Court would entertain it, but the Court will not undertake a *sua sponte* review of the record in order to perform that work for the parties.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment **(# 34, 36)**  is **GRANTED**.   The Clerk of the Court shall enter judgment in favor of the Defendants on all claims.   The parties' Motions to Restrict Access **(# 35, 40, 45)** are **DENIED**, and the Clerk of the Court shall lift all access restrictions on Docket # 34, 41, and 45.

Dated this 27th day of September, 2012

**BY THE COURT:**

Marcia S. Krieger
United States District Judge